IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

JOYCE A. PARNELL,                    )
                                     )
              Plaintiff,             )
                                     )
v.                                   )        CIVIL ACTION NO. 5:07-0390
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security,     )
                                     )
              Defendant.             )

<u>PROPOSED FINDINGS AND RECOMMENDATION</u>

This is an action seeking review of the final decision of the Commissioner of Social Security

denying the Claimant's application for disability insurance benefits (DIB) under Title II of the Social

Security Act, 42 U.S.C. §§ 401-433. This case was referred to the undersigned United States

Magistrate Judge by Standing Order to consider the pleadings and evidence, and to submit Proposed

Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).  (Doc.

No. 4.)  Presently pending before the Court are the parties' cross-Motions for Judgment on the

Pleadings. (Document Nos. 13 and 14.)

The Plaintiff, Joyce A. Parnell (hereinafter referred to as "Claimant"), filed an application for

DIB on February 20, 2004 (protective filing date), alleging disability as of August 15, 2002, due to

pain in her left shoulder, arm, tailbone, and legs; manic depression; panic attacks; and migraines. (Tr.

at 66, 67-69, 73.) The claim was denied initially and upon reconsideration. (Tr. at 39-41, 46-48.) On

March 14, 2005, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at

49.) A hearing was held on April 6, 2006, before the Honorable Lawrence E. Shearer. (Tr. at 513-63.)

On June 27, 2006, the ALJ issued a decision denying Claimant's claim for benefits. (Tr. at 16-30.) The

ALJ's decision became the final decision of the Commissioner on April 20, 2007, when the Appeals

Council denied Claimant's request for review. (Tr. at 7-10.) On June 19, 2007, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 1382c(a)(3)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 404.1520 (2006). If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. § 404.1520(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. § 404.1520(f) (2006). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical

2

shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

3

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must

----

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date. (Tr. at 28, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from severe impairments. (Tr. at 29, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or medically equal the level of severity of any listing in Appendix 1. (Tr. at 29, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity

to lift and carry 20 pounds occasionally and 10 pounds frequently. She can stand and/or walk six hours in an eight hour work day, sit for six hours, and occasionally perform climbing, balancing, stooping, kneeling, crouching, and crawling. She must avoid exposure to extremes of cold due to her left shoulder surgery, and should avoid concentrated exposure to heights. She retains the mental residual functional capacity for work that will accommodate moderate restrictions in her ability to maintain attention and concentration for extended periods, and moderate restrictions in her ability to interact with the general public.

(Tr. at 29, Finding No. 6.) At step four, the ALJ found that Claimant could not return to her past relevant work. (Tr. at 29, Finding No. 7.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a night watchman and night cleaner at the light exertional level, and as a system surveillance monitor and bench worker at the sedentary exertional level. (Tr. at 28-29, Finding No. 10.) On this basis, benefits were denied. (Tr. at 29.)

<u>Scope of Review</u>

The sole issue before this Court is whether the final decision of the Commissioner denying the

5

claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

Claimant's Background

Claimant was born on April 4, 1959, and was 47 years old at the time of the administrative hearing, April 6, 2006.[2] (Tr. at 67, 521-22.) Claimant has a generalized equivalency diploma ("GED") and no specialized training. (Tr. at 18, 79, 524.) In the past, she worked as a non-certified teacher and a cook. (Tr. at 18, 74, 82-88, 555-56.)

The Medical Record

The Court has considered all evidence of record, including the medical evidence and will discuss it in relation to Claimant's arguments.

---

[2] The ALJ reported in his decision that Claimant was born on April 1, 1959, and therefore, was a younger individual as defined by the Regulations. (Tr. at 18.) However, Claimant's Application and her testimony reveals that she actually was born on April 4, 1959. (Tr. at 67, 521-22.) Notwithstanding the ALJ's typographical error, the undersigned finds that the ALJ properly considered Claimant a younger individual.

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in (1) failing to re-contact Claimant's treating physician, Dr. Manuel C. Barit, M.D., to clarify inconsistencies the ALJ found in his progress notes and opinions, and (2) assessing Claimant's credibility and discounting Dr. Barit's opinion by requiring objective evidence of Claimant's pain. (Document No. 13 at 4-11.) The Commissioner asserts that these arguments are without merit and that the ALJ's decision is supported by substantial evidence. (Document No. 14 at 12-16.)

1. ALJ's Duty to Re-Contact a Medical Source.

Claimant first argues that in assessing Claimant's residual functional capacity ("RFC"), the ALJ erred in not re-contacting her treating physician, Dr. Barit, to clarify the discrepancies in handwriting between his progress notes and his form Medical Assessment of Ability to Do Work-Related Activities (Physical). (Document No. 13 at 5-7.) In his decision, the ALJ noted "that the handwriting on the medical source statement is clearly different from the handwriting contained in Dr. Barit's continuing office notes." (Tr. at 20.) Claimant asserts that the ALJ's comments imply some type of "misbehavior." (Document No. 13 at 5.) The Regulations and Social Security Rulings however, according to Claimant, do not require that the medical source statement be written in its entirety by the consultative evaluator. (Document No. 13 at 7.) Rather, the Regulations require only that the opinion be signed by the evaluator. (Id.) Furthermore, when the treatment notes and other medical evidence is "incomplete, inconsistent, or ambiguous," to the extent that it cannot be determined whether the claimant is disabled, Claimant asserts that the Regulations and Rulings require the ALJ to re-contact the medical source for clarification. (Document No. 13 at 6.) Claimant asserts that the ALJ should have re-contacted Dr. Barit for clarification. "[I]t is not logical to complain about the fact that Dr. Barit's

7

hand written notes are 'absolutely illegible' then reject an opinion clearly signed by Dr. Barit because it is written in a legible hand." (Document No 13 at 6-7.)

The Commissioner asserts that the ALJ stated his concerns regarding the medical source statement submitted by Dr. Barit and accorded Claimant's counsel the opportunity to seek clarification from Dr. Barit. (Document No. 14 at 12.) Claimant's counsel submitted type-written treatment notes, and therefore, the Commissioner argues that the ALJ was under no obligation to obtain further clarification. (Id.) Notwithstanding the handwriting discrepancy, the Commissioner asserts that the ALJ properly discounted Dr. Barit's opinion for other reasons because it was not supported by objective medical evidence, including Dr. Barit's own treatment notes. (Document No. 14 at 12-13.) Consequently, the issue of whether Dr. Barit completed the medical source statement is irrelevant. (Id.) Dr. Barit's treatment notes reflect that he intermittently saw Claimant "for treatment of musculoskeletal pain, as well as routine office visits," and did not impose any restrictions on her. (Document No. 14 at 13.) Objective medical evidence revealed only early degenerative arthritis of the lumbar spine, which the Commissioner asserts is "a normal part of the aging process," as is osteoarthritis. (Document No. 14 at 14.) This objective evidence contradicts Dr. Barit's opinion evidence. (Id.) Moreover, citing Mason v. Shalala, 994 F.2d 1058 (3d Cir. 1993), the Commissioner argues that Dr. Barit's medical source statement is weak as it is unaccompanied by thorough written reports. (Document No. 14 at 13.) Accordingly, the Commissioner asserts that the ALJ properly discounted Dr. Barit's opinion. (Document No. 14 at 12-14.)

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the

8

relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2006). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2) (2006).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do.  That is, the SSA need not accept only physicians' opinions.  In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

At the administrative hearing, the ALJ noted as a preliminary matter that he was troubled by Dr. Barit's medical source statement contained at Exhibits 32 and 36F, because it appeared that Dr. Barit did not fill out the form. (Tr. at 515.) The ALJ stated: "Dr. Bar[it]'s handwriting is so very different than the medical source statement. Dr. Bar[it]'s handwriting is essentially illegible. The information on that medical source statement is legible. It is very different than the signature, which does appear to be Dr. Bar[it]'s signature." (Tr. at 515.) The ALJ assumed that the medical source statement was completed by his nurse, but requested that Claimant's counsel seek clarification from

9

Dr. Barit as to whether he completed the form or whether the form was completed by someone else at his direction. (Tr. at 515-20.) The ALJ further noted that regardless of whether Dr. Barit completed the form, the opinions stated in the medical source statement were inconsistent. (Tr. at 517.) Particularly, the ALJ noted that the form indicated that Claimant's ability to lift and carry was affected by her impairments, and that she was limited to lifting or carrying a maximum of ten to fifteen pounds. (Tr. at 517.) However, the form further indicated that Claimant's maximum ability to lift or carry on an occasional basis was limited to thirty minutes to one hour and on a frequent basis from twenty to thirty minutes. (Tr. at 517.) The ALJ stated: "I don't have any idea what they think - - what I think they mean. The maximum, occasionally, maximum, frequently don't really relate to minutes. The form doesn't even follow and doesn't answer the questions asked." (Tr. at 517.) Furthermore, the ALJ stated that there was no objective basis for the limitations. (Tr. at 517.) The ALJ stated: [There's n]o indication of whether these limitations are based upon what the Claimant told him before, what he observed and what the actual observations are. So I really can't place any significant value even if this was filled out by Dr. Bar[it]." (Tr. at 517-18.)

In his decision, the ALJ accorded Dr. Barit's opinions that were contained in the medical source statement little weight. (Tr. at 20.) The ALJ explained his reasons as follows:

> The undersigned notes, however, that the handwriting on the medical source statement is clearly different from the handwriting contained in Dr. Barit's continuing office notes (34F, pp. 2 - 10). The undersigned requested clarification of this difference, but none was provided. Regardless of the statement's author, the physical limitations it sets forth are not supported in the medical notes, nor is there evidence that the claimant's osteoarthritis is "severe." The claimant did not report the severity of limitations reflected in the medical source statement to any physician, and in fact testified that Dr. Barit had imposed no limitations on her functioning. The objective lumbar x-rays and CT scan showed "early" degenerative arthritis, and no evidence of spondylolisthesis or stenosis (Exhibit 26F).

(Tr. at 20.)

10

Title 20, C.F.R. § 404.1512(e) requires the Social Security Administration ("SSA") to re-contact a medical source to obtain additional evidence or to seek clarification of evidence when the evidence received from that source "is inadequate for us to determine whether [the claimant is] disabled." 20 C.F.R. § 404.1512(e) (2006).[3] Specifically, additional evidence or clarification must be sought from the medical source "when the report from [the claimant's] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." Id. Such additional evidence or clarification may be obtained by the SSA requesting copies of the medical sources' records, obtaining a new or more detailed report from the medical source, or contacting the medical source by telephone. Id. Social Security Ruling 96-5p recapitulates the requirements of § 404.1512(e), and directs the ALJ to "make every reasonable effort to recontact

---

[3] Title 20, C.F.R. § 404.1512(e) provides:

(e) Recontacting medical sources. When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision. To obtain the information, we will take the following actions.

(1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily availalbe. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. We may do this by requesting copies of your medical source's records, a new report, or a more detailed report from your medical source, including your treating source, or by telephoning your medical source. In every instance where medical evidence is obtained over the telephone, the telephone report will be sent to the source for review, signature and return.

(2) We may not seek additional evidence or clarification from a medical source when we know from past experience that the source either cannot or will not provide the necessary findings.

20 C.F.R. § 404.1512(e) (2006).

[medical] sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear[.]"

In the instant case, the ALJ attempted to re-contact Dr. Barit through Claimant's counsel for clarification as to whether he authored the opinions stated in the medical source statement and whether his treatment notes supported the severe restrictions set forth in the statement. In response to the ALJ's request for clarification, Dr. Barit, through Claimant's counsel, submitted typed treatment notes from November 5, 2002, through March 15, 2006. (Tr. at 502-08.) Neither Dr. Barit nor Claimant's counsel submitted further information regarding the authorship of the medical source statement, despite the ALJ's specific request to do so. Nevertheless, the ALJ did not find that the discrepancies in the handwriting on the medical source statement and Dr. Barit's treatment notes prevented him from determining whether Claimant was disabled. Rather, on the basis of the typed treatment notes, the ALJ concluded that the opinions expressed in the medical source statement were inconsistent with the treatment notes and the other objective medical evidence of record. Accordingly, the undersigned finds that the ALJ's duty to contact Dr. Barit again, whether directly or through counsel, was not triggered. See Jackson v. Barnhart, 368 F.Supp.2d 504, 507-08 (D. S.C. 2005) (finding that the ALJ had no duty to recontact a medical source under 20 C.F.R. § 404.1512(e)(1) when that source's "ultimate conclusion regarding disability was wholly inconsistent with both the objective evidence contained in his treatment records and the records of the other physicians who examined [the claimant]."). To the extent that Dr. Barit's treatment notes and medical source statement were inconsistent or ambiguous, neither § 404.1512(e) nor SSR 96-5p obligated the ALJ to re-contact Dr. Barit. See Jarrells v. Barnhart, 2005 WL 1000255, *6 (W.D. Va. Apr. 26, 2005) (holding that the "Commissioner is not required to give treating medical sources a second opportunity to backfill an unsubstantiated disability opinion simply because the ALJ finds it to be unsupported. To do so, in effect, would be tantamount

to shifting the burden to the Commissioner to prove non-disability.").

2. <u>Pain & Credibility Assessment</u>.

Claimant also argues that the ALJ erred in discounting Dr. Barit's assessment and in assessing her credibility when he required objective medical evidence of the degree of pain she suffered. (Document No. 13 at 7-11.) First, citing <u>Hines v. Barnhart</u>, 453 F.3d 559 (4th Cir. 2006),  Claimant asserts that the ALJ improperly discounted Dr. Barit's medical source statement because the assessed limitations were not supported by objective evidence. (Document No. 13 at 8-9.) She further asserts that the ALJ "did not cite persuasive evidence which would override the opinion of Dr. Barit in that the other opinions were offered by non-examining state agency experts who were not specialists in any field connected to the claimant's impairments which might give them special expertise." (Document No. 13 at 9.)

Second, Claimant asserts that in assessing her credibility, the ALJ initially determined that she had objective symptoms of conditions that could cause pain, but then required objective evidence of the pain. (Document No. 13 at 9-11.) Particularly, the ALJ acknowledged Claimant's testimony regarding her pain and limitations, but found that it was inconsistent with statements she reported to a psychologist six months earlier. (Document No. 13 at 9.) She asserts that essentially, the ALJ "[threw] out the medical source statement by Dr. Barit which supported the claimant's complaints, then den[ied] her benefits because she had no medical source statement that supported her limitations." (Document No. 13 at 10.) Claimant further asserts that the ALJ failed to consider all the evidence of record and improperly relied on an outdated RFC assessment, that of a non-examining state agency expert whose opinions were made two years prior to the administrative hearing. (Document No. 13 at 11.) Citing <u>Hines</u>, Claimant argues that the ALJ discussed only the evidence that favored his ultimate decision. (<u>Id.</u>)

13

The Commissioner asserts, as stated above, that the ALJ properly accorded little weight to Dr. Barit's opinion because it was not supported by the medical evidence, including Dr. Barit's treatment notes and the objective radiological evidence. (Document No. 14 at 13-14.) Regarding Claimant's credibility, the Commissioner asserts that the ALJ properly "considered what the record as a whole demonstrated about certain factors, in finding that Plaintiff's allegations of totally disabling pain and symptoms were not entirely credible." (Document No. 14 at 14-15.) The ALJ considered the opinions of the medical consultants and adopted the opinions of the state agency medical consultants that were supported by the evidence of record. (Document No. 14 at 15.) Furthermore, the ALJ considered Claimant's testimony regarding her activities of daily living and found the accounts to be inconsistent with prior statements reported during a consultative psychological exam. (Id.) Accordingly, pursuant to 20 C.F.R. § 404.1529, the ALJ "properly determined that Plaintiff's statements about her condition were not entirely credible based, in part, on the objective medical evidence, and the residual functional capacity assessments of the non-examining state agency physicians, as well as Plaintiff's own statements about her daily activities." (Document No. 14 at 16.)

    *A. Treating Physician's Opinion.*

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2004). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for

benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2), 416.927(d)(2)(2006); see also, Johnson v. Barnhart, 434 F.3d 650, 654 (4tha Cir. 2005).

The RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2)(2006).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted). Although medical source opinions are considered in evaluating an individual's residual functional capacity, the final responsibility for determining a claimant's RFC is reserved to the Commissioner. See 20 C.F.R. § 404.1527(e)(2) (2006). In determining disability, the ALJ must consider the medical source opinions "together with the rest of the relevant evidence we receive." Id. § 404.1527(b).

15

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2); 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner . . . ." Id. §§ 404.1527(e)(3), 416.927(e)(3). The regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1546; 416.946 (2006). However, the adjudicator must still apply the applicable factors in 20 C.F.R. §§ 404.1527(d) and 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Security Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Dr. Barit completed a medical source statement, dated March 14, 2006, finding that Claimant could lift or carry a maximum of ten to fifteen pounds, lift or carry a maximum occasionally from thirty minutes to an hour, and lift or carry a maximum frequently from twenty to thirty minutes. (Tr. at 498.) Dr. Barit indicated that this limitation was attributed to Claimant's osteoarthritis of her back. (Id.) Dr. Barit also found that Claimant could stand or walk two to three hours in an eight hour day, and twenty to thirty minutes without interruption. (Tr. at 499.) He attributed these limitations to Claimant's severe back and hip pain and degenerative disk disease. (Id.) Dr. Barit further found that Claimant was limited to sitting only two to three hours in an eight hour day for a total of twenty to thirty minutes without interruption. (Id.) This limitation again was limited to her severe back and hip pain, which is exacerbated on sitting for extended periods of time. (Id.) Dr. Barit additionally found that Claimant could never climb and crouch, and could occasionally balance, stoop, kneel, and crawl; was limited in her ability to reach and push/pull; and was restricted from performing activities

16

involving moving machinery, temperature extremes, and vibration. (Tr. at 499-500.) These limitations also were attributed to Claimant's severe back and hip pain, severe osteoarthritis, and degenerative disk disease, which are exacerbated with movement, temperature extremes, and vibration. (Id.)

Dr. Barit's treatment notes reflect his examination of Claimant from November 5, 2002, through March 15, 2006. (Tr. at 502-08.) On November 5, 2002, and February 25, 2003, Dr. Barit diagnosed Claimant as suffering from a panic disorder and anxiety. (Tr. at 502.) He prescribed Celexa 20mg and Xanax .5mg, as well as Bextra 10mg. (Id.) On July 14, 2003, it was noted that Claimant fell in 1994, which resulted in a cracked tailbone, and was then complaining of pain in both knees radiating to her lower legs. (Tr. at 503.) Dr. Barit noted that Claimant had tried with no relief, non-steroidal anti-inflammatory drugs, Ultracet, and Darvocet. (Id.) On exam, Claimant presented with tenderness of her lower sacral spine, for which Dr. Barit prescribed Lortab 7.5 mg, and diagnosed sacroiliitis. (Id.) On September 5, 2003, Dr. Barit noted that Claimant was having "all kinds of trouble" with her legs and could not sleep at night, presumably due to the pain resulting from her cracked tailbone. (Id.) He diagnosed back pain and prescribed Hydrocodone 7.5mg, as well as Xanax 10mg. (Id.) In October, 2003, Claimant continued to complain of back and leg pain associated with bruising of her tailbone and mid-lumbar spine. (Id.) On exam, she presented with tenderness in the mid-lumbar spine, and Dr. Barit continued her on Lortab and Xanax. (Id.)

On December 15, 2003, Claimant presented with facial numbness and headaches, for which Dr. Barit diagnosed bells palsy and prescribed Prednisone 10mg, Lortab 7.5mg, as well as Xanax .5 mg. (Tr. at 504. ) Nearly one year later on November 8, 2004, Claimant again complained of back, leg, and tailbone pain, as well as pain in her shoulders. (Id.) It was noted that she had undergone arthroscopic surgery on her left shoulder. (Id.) Dr. Barit diagnosed Claimant as suffering from acute situational anxiety and osteoarthritis, for which he prescribed Lortab 10mg and Crestor 10mg. (Id.) On

January 3, 2005, Dr. Barit diagnosed dyslipidemia, anxiety, and depression, and on May 17, 2005, degenerative disc disease per x-rays of her spine. (Tr. at 505.) On June 16, 2005, Claimant continued to complain of pain, especially with cleaning her house. (Tr. at 506.) In August, 2005, Dr. Barit diagnosed a disc bulge with degeneration, pursuant to a CT scan. (Id.) He continued her on Lortab, Xanax, and Crestor. (Id.) Claimant was involved in a motor vehicle accident on November 21, 2005, and experienced multiple bruises and tenderness to her chest, lumbar spine, and hips, but suffered no broken bones or head injury. (Tr. at 507.) On December 5, 2005, Claimant complained that she could not put pressure on her right foot, that her legs were giving way, and that she experienced tenderness of her right chest and ribs. (Id.) Dr. Barit diagnosed arthritis of Claimant's right hip and multiple contusions on her chest. (Id.) Claimant again complained of chest tenderness on December 19, 2005. (Id.) On February 16, 2006, Dr. Barit noted that her injuries resulting from the motor vehicle accident had been resolved, but that she continued to complain of non-related pain in her leg and tailbone. (Tr. at 508.) Dr. Barit diagnosed back pain, and continued her prescriptions of Crestor and Lortab. (Id.) Finally, on March 15, 2006, Claimant continued to complain of back pain, which radiated down both legs, with tenderness to the lumbo-sacral area. (Id.) Dr. Barit prescribed Lexapro 10mg and continued her on Lortab 10mg. (Id.)

In addition to Dr. Barit's treatment notes and medical source statement, the evidence of record regarding Claimant's physical impairments reveals that Claimant underwent a consultative examination by Andres Rago, M.D., on May 24, 2004. (Tr. at 267-73.) Claimant complained of chronic pain in her left shoulder, left arm, legs, and coccyx, as well as anxiety or panic attacks, and headaches. (Id.) She reported that she fell in June, 1994, injuring her coccyx. (Tr. at 267.) Though she incurred only bruises to her coccyx and shoulder areas, she had severe pain which was aggravated by walking. (Id.) Physical therapy improved the pain, particularly in the left shoulder. (Id.) Subsequently

however, she had occasional exacerbation of the pain which progressed into chronic pain in both legs, without any specific injury to her lower extremities. (Id.) Arthroscopic surgery and physical therapy improved her left shoulder pain. (Id.) Claimant further reported that she experienced recurrent, pounding, severe headaches with photophobia and phonophobia. (Tr. at 268.) She stated that she was unable to walk during the episode of a severe headache, and that the headaches lasted for many hours. (Id.) At the time of the exam, she was not taking any medications for the headaches. (Id.)

On exam, Dr. Rago observed that Claimant constantly was shaking her right lower extremity, though she ambulated normally, without assistive device. (Id.) She was able to walk on her heels and toes, and could squat with some popping of the knees. (Tr. at 269-70.) Dr. Rago noted that prolonged sitting aggravated Claimant's lower back pain, though she exhibited no areas of tenderness. (Id.) Claimant presented with tenderness at the posterolateral aspects of her neck, which worsened toward the shoulder bilaterally, though there were no limitations of motion of the neck and head. (Tr. at 270.) She also presented with slight tenderness at the shoulder area, but again, there was no limitation of motion of the upper and lower extremities. (Id.) Neurologically, Dr. Rago observed no muscle weakness or atrophy, and Claimant was able to write, button, and pick up coins with either hand, without difficulty. (Id.)

Dr. Rago concluded that the pain Claimant experienced possibly was associated with traumatic arthritis of her left shoulder and coccyx. (Tr. at 271.) The left arm and lower extremity pain, according to Dr. Rago, was referred pain from the left shoulder joint and pain at the lumbosacral area. (Id.) He further concluded that the nature of the headaches Claimant described were indicative of migraine headaches, but noted that she was not taking any medications and denied headaches during the exam. (Id.)

The objective evidence of record demonstrates that Claimant was diagnosed with early

degenerative arthritis by lumbar spine x-rays on April 28, 2005. (Tr. at 361.) A CT scan of her lumbar

spine on July 14, 2005, revealed no evident spondylolisthesis or gross central canal or foraminal

stenosis, but posterior disk bulges at L3-4 and L4-5. (Tr. at 362.) The x-rays of Claimant's cervical

spine on July 14, 2005, however, revealed no significant narrowing of intervertebral neural foramina,

or any other acute or significant cervical spine abnormality. (Tr. at 363.) As noted above, Claimant

underwent arthroscopic surgery of her left shoulder on September 22, 2000. (Tr. at 374-75.)

Finally, Dr. Go, a non-examining state agency consultant, completed a physical RFC

assessment on June 11, 2004, finding that Claimant was limited to performing light exertional

activities, with occasional limitations of postural activities. (Tr. at 274-81.) Dr. Go further found that

Claimant should avoid concentrated exposure to extreme cold and heights. (Tr. at 278.) Dr. Go

acknowledged Claimant's pain in her left shoulder and her arthroscopic surgery, but noted that she had

normal flexion and range of motion. (Tr. at 277.) In summary, Dr. Go stated:

> She has pains of [left] shoulder, tailbone, legs & migraine headaches.
> Had treatment of [left] shoulder & tailbone pain & pains [are] now improved.
> Her pain & symptoms are credible in 1994 at time of fall injuries, however, this is now some 9 ½ years later, she is improved w/treatment & has normal flexion of [left] shoulder & normal abduction.
> Her [activities of daily living] are not severely restricted. She is restricted to do only light work, becasue of her aforementioned pain & symptoms.

(Tr. at 279.) Dr. Go's assessment was affirmed by other medical sources on September 20, 2004, and

October 8, 2004. (Tr. at 281.)

As demonstrated above, Dr. Barit's assessed limitations are inconsistent with his rather

conservative treatment notes. Though Dr. Barit described Claimant's pain and osteoarthritis in the

medical source statement as being severe, his treatment notes do not reference any such modifier.

Rather, he noted that Claimant had shoulder, neck, back, tailbone, leg, and knee pain, and stated the

diagnoses of sacroiliitis, headache, osteoarthritis, degenerative disk disease, dyslipidemia, chronic back

20

pain, and arthritis of the right hip. The notes from Dr. Barit's physical exams of Claimant essentially are normal, with Dr. Barit specifically noting on December 19, 2005, and February 16, 2006, that her extremities were "normal." (Tr. at 507-08.) Absent from any of the treatment notes are references to the severity of Claimant's impairments as stated either by Claimant or Dr. Barit, and any limitations resulting from her impairments. Claimant conceded at the administrative hearing that Dr. Barit never placed any limitations on her activities. (Tr. at 530.) She also conceded that she had never told any of her physicians, presumably Dr. Barit, about certain conditions, including her shaking her legs. (Tr. at 553-54.) Yet, Dr. Barit assessed stringent limitations on Claimant's abilities that are not supported by his treatment of her.

Furthermore, the undersigned finds that Dr. Barit's assessed limitations are inconsistent with the objective evidence of record. Specifically, the x-rays and CT scans of Claimant's lumbar spine revealed only early degenerative arthritis and some posterior disk bulges. However, there was no evidence of spondylolisthesis or stenosis.

In Hines, the Fourth Circuit found that the ALJ improperly refused to credit the claimant's treating physician's medical opinion that the claimant totally was disabled because "a laundry list of objective indicators did not appear in [the physician's] medical records." Hines, 453 F.3d at 563-64. Relying on Hines, Claimant in the instant case argues that the ALJ improperly discredited Dr. Barit's opinion because it was not supported by objective evidence of record. In discrediting the opinion of Dr. Barit in this case however, the ALJ properly concluded that nothing in Dr. Barit's treatment notes demonstrated that Claimant's conditions were as severe as stated in his opinion; he placed no restrictions on her and there is no indication that Claimant reported to Dr. Barit the severity of limitations reflected in his opinion. The diagnostic evidence demonstrated only early degenerative arthritis. Furthermore, contrary to Hines, the ALJ in the instant case, as discussed herein, analyzed and

21

weighed Dr. Barit's opinion according to the factors in 20 C.F.R. §§ 404.1527(d)(2)-(6).

Claimant further argues that the ALJ failed to "cite persuasive evidence which would override the opinion of Dr. Barit in that the other opinions were offered by non-examining state agency experts who were not specialists in any field connected to the claimant's impairments which might give them special expertise." (Document No. 13 at 9.) The ALJ adopted the opinions of the state agency medical sources, particularly the opinion of Dr. Go regarding Claimant's physical limitations. Though Dr. Go was a non-examining medical source, whose opinion was assessed on June 11, 2004, his opinion was affirmed on two subsequent occasions, September 20, 2004, and January 10, 2005, by other non-examining state agency medical sources. Nevertheless, as the latter medical sources noted, there is no evidence that Claimant's condition worsened between the time of Dr. Go's opinion and the date of the ALJ's decision. Dr. Go's opinion was consistent with the evidence of record, and therefore, the ALJ was entitled to rely upon it. See Smith v. Schweiker, 795 F.2d 343, 356 (4th Cir. 1986) (stating that "the testimony of a non-examining physician can be relied upon when it is consistent with the record" and that "if the medical expert testimony from examining or treating physicians goes both ways, a determination coming down on the side of the non-examining, non-treating physician should stand."). Accordingly, the undersigned finds that the ALJ's decision regarding the weight accorded Dr. Barit's opinion is supported by substantial evidence.

B. *Pain and Credibility Assessment*.

A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain or symptoms alleged. 20 C.F.R. §§ 404.1529(b) and 416.929(b) (2006); SSR 96-7p; See also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). If such an impairment is established, then the intensity and persistence of the pain or symptoms and the extent

22

to which they affect a claimant's ability to work must be evaluated.  Id. at 595.  When a claimant

proves the existence of a medical condition that could cause the alleged pain or symptoms, "the

claimant's  subjective complaints [of pain] must be considered by the Secretary, and these complaints

may not be rejected merely because the severity of pain cannot be proved by objective medical

evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain

should be gathered and considered, but the absence of such evidence is not determinative.  Hyatt v.

Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered

to diminish her capacity to work to the extent that alleged functional limitations are reasonably

consistent with objective medical and other evidence.  20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4)

(2006).  Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior
> work record, your statements about your symptoms, evidence submitted by your
> treating, examining, or consulting physician or psychologist, and observations by our
> employees and other persons.  . . .  Factors relevant to your symptoms, such as pain,
> which we will consider include:
>
> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other
> symptoms.
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you
> take or have taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, you receive or have received for relief
> of your pain or other symptoms;
>
> (vi) Any measures you use or have used to relieve your pain or other symptoms
> (e.g., lying flat on your back, standing for 15 or 20 minutes every hour,
> sleeping on a board, etc.); and
>
> (vii) Other factors concerning your functional limitations and restrictions due to pain
> or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2006).

SSR 96-7p repeats the two-step regulatory provisions:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" in assessing the credibility of an individual's statements. Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other evidence in determining whether the claimant's impairment is "severe" within the meaning of the Regulations. A "severe" impairment is one which significantly limits the physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a

24

claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig, 76 F.3d at 585, 594; SSR 96-7p ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. Id. at 595. Nevertheless, Craig does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical evidence.

The ALJ noted the requirements of the applicable law and Regulations with regard to assessing pain, symptoms, and credibility. (Tr. at 24-26.) With regard to the threshold test, which is outlined above, the ALJ found that Claimant's "medically determinable impairments could reasonably be expected to produce pain and other symptoms." (Tr. at 25.) Thus, the ALJ made an adequate threshold finding and proceeded to consider the intensity and persistence of Claimant's alleged symptoms and the extent to which they affected Claimant's ability to work. (Tr. at 25-26.) At the second step of the analysis, the ALJ concluded that "[t]he severity of these symptoms, as alleged by the [C]laimant, and the effect on the [C]laimant's ability to work, however, are not fully supported by objective medical evidence alone." (Tr. at 25.) Despite this statement, which on its face purports to require objective evidence of pain, the ALJ's decision as a whole reflects that the ALJ properly considered the factors set forth in 20 C.F.R. § 404.1529(c)(3).

The ALJ summarized Claimant's testimony in his decision, noting that Claimant's impairments had worsened resulting in her ability to stand for only ten to thirty minutes, sit for 45 minutes, and lift only a case of soft drinks. (Tr. at 25, 536.) He summarized the treatment records, noting Claimant's

complaints of migraine headaches and shoulder, back, and leg pain. (Tr. at 18-19, 533, 545, 551.) The ALJ thus noted the nature and location of Claimant's pain, and further noted that though she ambulated without any assistive device, prolonged sitting aggravated her back pain. (Tr. at 19, 536.) Claimant also reported in June, 2005, to her treating physician that she had experienced bad pain when house cleaning. (Tr. at 19.) The ALJ considered Claimant's treatment, consisting of follow-up examinations and medication management visits, and noted that the record failed to demonstrate any other methods of treatment utilized to relieve her symptoms. (Tr. at 25-26.) He noted that as of May, 2004, however, Claimant reported that she took no medication for her migraine headaches. (Tr. at 19.) The ALJ also noted that despite Claimant's reports, she exhibited only slight tenderness in the neck and shoulder area in May, 2004, without any limitation of motion.

Regarding Claimant's mental impairments, the ALJ summarized Claimant's testimony and reports that she experienced problems in focusing and concentrating. (Tr. at 25.) As mentioned above, the ALJ summarized Claimant's testimony that she had difficulty understanding what she read. (Tr. at 25.) The ALJ summarized the medical evidence of record, which revealed that Claimant was admitted to a hospital voluntarily in August, 2000, when she was diagnosed with major depressive disorder, and that prior thereto, she reported that she had suicidal ideations and an attempt on two occasions in 2000. (Tr. at 20.)

The ALJ noted that Claimant received no mental health treatment from July, 2001, through June, 2002. (Tr. at 21.) On April 15, 2003, Claimant established mental health treatment at Southern Highlands Community Health Center with Dr. George B. Ide, D.O., Clinic Psychiatrist. (Tr. at 21, 224-59.) Claimant reported a depressed mood, anhedonia, problems sleeping, poor energy, daytime tiredness, and migraines. (Tr. at 21, 254.) She further reported that she had experienced panic attacks for one year, which sometimes were precipitated by stressful situations and were accompanied by

26

tachycardia and sweating. (Id.) On mental status exam, Dr. Ide observed an "okay" mood, broad affect, intact cognition, normal memory, good insight, intact judgment, and above average intellect. (Tr. at 21, 255.) He noted Claimant's admission of severe paranoia, but her denial of recent suicidal ideations. (Id.) Dr. Ide diagnosed major depressive disorder, panic disorder with agoraphobia, and a global assessment of functioning of 58, which was indicative of only moderate limitations.[4] (Tr. at 25, 256.) He increased Claimant's Lexapro to 30 mg and continued her Xanax. (Id.)

Throughout Dr. Ide's treatment of Claimant, she reported complaints of shakiness, crying spells, recurring nightmares, marital problems, and suicidal ideation on one occasion. (Tr. at 21, 226, 243, 248, 251.) Claimant reported that her sleeping problems were helped with Seroquel. (Tr. at 21, 248.) The ALJ noted that Dr. Ide imposed no limitations on her activities due to her mental impairments. (Tr. at 25.)

On November 19, 2004, Claimant underwent a mental status examination by Melinda Wyatt, M.S., Licensed Psychologist. (Tr. at 21, 305-311.) At that time, Claimant reported a daily depressed mood, decreased energy, little initiative, a lack of interest in activities, irritability, and being increasingly withdrawn. (Tr. at 21, 306.) She further reported sporadic panic attacks and past suicidal ideation on one occasion one month prior to the evaluation. (Id.) Claimant indicated that she experienced insomnia, feelings of hopelessness and worthlessness, discomfort with crowds, and a decreased appetite. (Id.) On mental status exam Claimant was cooperative, motivated, had adequate eye contact, spontaneously generated conversation, had relevant and coherent speech, and was oriented

---

[4] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 51-60 indicates that the person has "[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") 32 (4th ed. 1994).

in all spheres. (Tr. at 21, 307.) Her facial expressions indicated a depressed mood and her affect was flat. (Tr. at 21, 307-08.) Claimant had an organized and logical stream of thought, adequate insight, average judgment, adequate concentration, normal persistence and pace, normal immediate and recent memory, and mildly impaired remote memory. (Tr. at 21, 308.) Her psychomotor behavior was characterized by tremors of the hands and legs throughout the interview. (Id.) Ms. Wyatt diagnosed major depressive disorder, recurrent, severe without psychotic features, and panic disorder with agoraphobia. (Tr. at 22, 309.)

The ALJ also summarized Claimant's testimony regarding her activities of daily living, including her statements that she could not understand what she read, could not cook a full meal or wash dishes, and spent most of the day in bed. (Tr. at 25, 541, 551.) Claimant however, testified that she could dress herself, climb stairs independently, and drive a motor vehicle. (Tr. at 25, 537-38.) She stated that she drove to visit her mother, whom she visited regularly, as well as her children in North Carolina. (Tr. at 25, 538-39.) The ALJ noted Claimant's activities as reported to Ms. Wyatt on mental status examination on November 18, 2004. (Tr. at 24, 309.) At that time Claimant reported that she used to enjoy reading novels and cross-stitching but was no longer able to focus or remain still to complete these activities. (Tr. at 24, 309.) Claimant also reported that though the television usually remained on, she found it difficult to focus on a program. (Id.) She stated that she shared in all household chores with her husband, as well as in preparing convenient foods, purchasing groceries, and managing the finances. (Id.) Claimant indicated that she previously enjoyed cooking but had lost interest in this activity. (Id.) She reported that she visited her children in North Carolina approximately once a month, visited her mother at least once every two or three weeks, and ceased attending church on a regular basis four years ago due to depression. (Id.) The ALJ concluded that Claimant's testimony regarding her limited activities of daily living was inconsistent with those activities she reported to Ms.

28

Wyatt. (Tr. at 25.)

These activities are consistent with those Claimant reported on form Function Reports - Adult, dated August 4, 2004, September 14, 2004, and December 6, 2004, as well as activities reported on a form Activities of Daily Living dated March 29, 2004, and a form SSA questionnaire dated March 29, 2005. (Tr. at 89-95, 102-09, 110-18, 119-26, 127-29.) At that time, Claimant reported that she used to bathe daily, but that decreased to two or three times a week, and that she did not always brush her hair. (Tr. at 120.) She indicated that she prepared simple meals for breakfast, whereas she used to cook full course meals for breakfast and dinner. (Tr. at 121.) She also reported that her husband helped with household chores such as cleaning and laundry, as well as managing their finances. (Tr. at 121-22.) Regarding driving, she reported that she drove only when she had to, and went to the grocery store once a month and to the pharmacy every two weeks. (Tr. at 122-23.) Due to nervousness and problems concentrating, she reported that she could no longer read, cross stitch, or watch television. (Tr. at 123.)

The ALJ concluded that while Claimant's activities of daily living were limited to a degree as a result of her impairments, "the alleged severity of limitation is not supported by the treatment notes." (Tr. at 26.) To accommodate this limitation, the ALJ determined that Claimant's mental impairments resulted in mild to moderate limitations in her activities of daily living, and no more than moderate limitations in her ability to maintain social functioning, concentration, persistence, or pace. (Tr. at 24.) He noted that "[t]he issue is not whether the claimant has pain and symptoms, but whether her pain is so severe as to be disabling. Subjective complaints are subject to being discounted if there are inconsistencies in the evidence as a whole. (20 CFR § 404.1529)." (Tr. at 26.) The ALJ found that Claimant's pain was not disabling.

"Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted

to the extent they are inconsistent with the available evidence." <u>Hines</u>, 453 F.3d at 565. The ALJ

properly considered the factors of 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3), and determined that

Claimant's allegations were inconsistent with the evidence of record as a whole. This decision is in

conformity with the Regulations and the directives of <u>Hines</u>.[5] Accordingly, the undersigned finds that

Claimant's argument is without merit and that substantial evidence supports the ALJ's pain and

credibility assessment.

     For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the District

Court confirm and accept the foregoing findings, **DENY** Plaintiff's Motion for Judgment on the

Pleadings (Document No. 13.), **GRANT** the Commissioner's Motion for Judgment on the Pleadings

(Document No. 14.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from

the Court's docket.

     The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**,

---

     [5] In <u>Hines</u>, the Fourth Circuit reiterated the Commissioner's "Policy Interpretation Ruling," which states in part as follows:

> **FOURTH CIRCUIT STANDARD**: Once an underlying physical or ental [sic] impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence. If an underlying impairment capable of causing pain is shown, subjective evidence of pain, its intensity or degree can, by itself, support a finding of disability. Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available, should be obtained and considered. Because pain is now readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.

In accordance with this Standard, the undersigned finds that the ALJ considered the evidence of record as a whole and did not require objective proof of Claimant's pain and other symptoms.

and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then ten days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

DATE: August 27, 2008.

R. Clarke VanDervort
United States Magistrate Judge

31